Barney, Judge,
delivered the opinion of the court:
The decision in this suit arises upon a demurrer of the defendants to the plaintiff’s petition. The averments of the *112 petition are substantially as follows: The plaintiff is the sole heir of John Kouns, who was the surviving partner of a firm composed by George L. Kouns and John Kouns, both deceased. On the 6th day of June, 1865, said firm was the owner of 900 bales of cotton, of which 350 bales had been raised in the State of Texas and purchased by said firm and the balance in greater part raised by it on its own plantation in the State of Louisiana. This cotton on the above date was brought by said firm to the city of New Orleans. At that time the purchasing agent of the Government at New Orleans, appointed by the Secretary of the Treasury under the act of July 2, 1864, 13 Stat. 375, was Otis N. Cutler. On the arrival of said cotton at New Orleans said Cutler as such agent took the same into his possession and refused to release it until its said owner paid to him one-fourth of the market value thereof, the same being the sum of $30,777.50. Said firm paid said sum under protest, whereof $13,695.92 was paid on June 12th and the balance between June 15th and 20th, 1865. Said sum so collected by said Cutler of said firm was placed in the Treasury of the United States and now remains there.
The plaintiff seeks to recover said sum from the defendants by virtue of the several statutes hereinafter cited and discussed. It is averred that the plaintiff has been recognized by the civil district court of the parish of Orleans, in the State of Louisiana, where said John Kouns was domiciled at the time of his death, as his sole heir and as such has been declared to be entitled to the possession of all of his estate, including choses in action. Whether such right would entitle her to bring a suit for such entire copartnership claim might perhaps be questioned, but as the decision of that question would only determine the proper parties to this suit it is neither considered nor decided, but we have deemed it advisable to decide the demurrer upon the legal merits of the claim set out in the petition.
We now come to a discussion of the statutes the construction of which determines this question. By section 3 of the act of July 13, 1861, 12 Stat., 255, it was enacted that it would be lawful for the President by proclamation to de *113 clare that the inhabitants of any State or part of a State in rebellion were in a state of insurrection, and that thereupon all commercial intercourse by and between the same and citizens thereof and citizens of the rest of the United States should cease and be unlawful. August 16, 1861, the President declared, among others, the States of Louisiana and Texas to be in a state of insurrection and forbade all commercial intercourse between the same and the citizens of other States. Such was the state of affairs as to the citizens of those two States and their rights and privileges when the law commonly known as the captured and abandoned property act, 12 Stat., 820, was enacted. It provided, among other things, for the appointment of agents of the Government to receive and collect abandoned or captured property within insurrectionary districts (not including war materials) and to sell the same in the manner directed and pay the proceeds thereof into the Treasury of the United States. The act further provided that “ at any time within two years after the suppression of the rebellion any person claiming to have been the owner of such abandoned and captured property could bring suit ” in this court for the recovery of the proceeds thereof so paid into the Treasury, less expenses of sale, transportation, etc., upon proof of ownership, and, in addition, that he had not given any aid or comfort to the rebellion.
The act of July 2, 1864, 13 Stat. 375, was entitled, “An act in addition to the several acts concerning commercial intercourse between loyal and insurrectionary States, and to provide for the collection of captured and abandoned property, and the prevention of frauds in States declared in insurrection.” Section 8 of that act is as follows :
“ Seo. 8. And be it further enacted, That it shall be lawful for the Secretary of the Treasury, with the approval of the President, to authorize agents to purchase for the United States any products of States declared in insurrection, at such places therein as shall be designated by him, at such prices as shall be agreed on with the seller, not exceeding the market value thereof at the place of delivery, nor exceeding three-fourths of the market value thereof in the city of New York at the latest quotations known to the agent *114 purchasing: Provided, That no part of the purchase money for any products so purchased shall be paid, or agreed to be paid, out of any other fund than that arising from property sold as captured or abandoned, or purchased and sold under the provisions of this act. All property so purchased shall be forwarded for sale at such place or places as shall be designated by the Secretary of the Treasury, and the moneys arising therefrom, after payment of the purchase money and the other expenses connected therewith, shall be paid into the Treasury of the United States; and the accounts of all moneys so received and paid shall be rendered to, and audited by, the proper accounting officers of the Treasury.”
The Secretary of the Treasury, in the administration of the above section, made certain regulations, among which he provided that agents appointed according to its provisions should confine their purchases to cotton, and that to meet its requirements they should receive all cotton so brought and forthwith return to the seller three-fourths thereof of the average grade of the whole, or retain out of the price thereof the difference between three-fourths of the market price and the full market price in the city of New York. In further pursuance of the authority conferred by said section, the Secretary of the Treasury designated certain cities, among them the city of New Orleans, as purchasing places, and appointed purchasing agents, among them the above-named Otis N. Cutler, as before stated. His taking into his possession the cotton in question and the exaction from said firm of the value of one-fourth of the market price thereof, is averred in the petition as heretofore stated.
The plaintiff bases her right to recover in this suit upon the above statutes to be construed in connection with section 162 of the Judicial Code, which is as follows:
“ Sec. 162. The Court of Claims shall have jurisdiction to hear and determine the claims of those whose property was taken subsequent to June 1, 1865, under the provisions of the act of Congress approved March 12, 1868, entitled ‘An act to provide for the collection of abandoned property and for the prevention of frauds in insurrectionary districts within United States,’ and acts amendatory thereof, where the property so taken was sold and the net proceeds thereof were placed in the Treasury of the United States; and the Secretary of the Treasury shall return said net proceeds to the *115 owners thereof, on the judgment of said court; and full jurisdiction is given to said court to adjudge said claims, any statutes of limitations to the contrary notwithstanding.”
As we understand the contention of the plaintiff, it is that in substance and effect one-fourth of her cotton was taken subsequent to June 1, 1865, and the proceeds thereof placed in the Treasury, and which fact gives her a cause of action in this court under said section.
In 1871 the Kouns firm before mentioned brought a suit in the Circuit Court for the Southern District of the State of New York against said Cutler to recover back the money so paid to him under the circumstances as before stated, and there recovered judgment for the same. The case went to the Supreme Court, where this judgment was reversed. The questions presented in that case were, (1) whether Cutler had lawfully collected one-fourth of the market value of the cotton in question; (2) whether the action was barred by section 7 of the act of March 3, 1863, 12 Stat., 755. Upon both of these questions the Supreme Court decided in favor of the defendants. There was some discussion in the case as affecting the first question as to the effect of certain proclamations of the President in their application to the States in which the cotton in question was raised and afterwards taken by Cutler, but that question is not believed to enter into this case, as we think it is conceded that the cotton and its disposal came within the provisions of section 8 of the act of July 2, 1861. In discussing the general question, the court said:
“ We think the money sued for is the money of the United States. When the cotton reached New Orleans on June 6 it was subject to an exaction of one-fourth its market value in New York. The owners had been allowed to bring in their cotton upon the implied promise and understanding that they would sell it to the Government for three-fourths the market price. Upon its arrival in New Orleans the rights of the Government in the cotton became fixed. One-fourth its value was as much the property of the Government as the other three-fourths were the property of the defendants in error. No proclamation of the President could transfer the property of the Government to them. The purchasing agent, for the accommodation of defendants in error, had allowed them *116 to pay the amount due the Government in three installments. The fact that the proclamation intervened between the payment of the first and the second installments could not relieve the defendants in error from the payment of money actually due to the United States. The President had no more power to exonerate them from the payment of the sum due than he has to relieve an importer from the payment of duties on his imported merchandise.” 110 U. S. 720, 726, 727.
It is thus settled beyond question that the money which is sought to be recovered back in this case was legally exacted from the said copartnership firm and became the absolute property of the United States.
Section 162 above quoted provides for a recovery of judgment in this court for money in the Treasury arising from the proceeds of “ property taken and sold ” under the provisions of said act of March 12, 1863, and acts amendatory thereof. This implies the taking of such property and its sale without any intervention of the owner. Section 8 of the act of July 2, 1864, although nominally amendatory of the captured and abandoned property act of March 3, 1863, was in reality supplementary to the same and was for the purpose of enabling citizens in insurrectionary territory to dispose of their cotton to the Government and thus not be compelled to submit to having it seized by the Federal forces with the probability of never receiving anything for it. The one-fourth taken possession of under the authority of that act was not “ taken ” within the meaning of either the act of March 3, 1863, or said section 162, but was taken pursuant to an agreement authorized to be made by the act of July 2, 1864. Hence it follows that the money sought by the plaintiff to be recovered in this case was never “taken” from him within the meaning of any of those acts, but was paid to the Government pursuant to a lawful agreement and thus became the property of the Government subject to no trust or obligation of any kind.
It was said in Lincoln v. United States, 50 C. Cls., 70, 73: “ The effect of section 162 is to revive the captured or abandoned property act so far as the remedies it provided are concerned and to again provide a forum for the enforcement of the rights declared in said section.” It is pointed *117 out further along that one material requirement was eliminated, namely, the proof of loyalty if the date of the seizure came within the terms of said section. Hence it follows that the decisions of this court and the Supreme Court as to the construction of the captured or abandoned property act have pertinent application here. It has been unanimously held, both by this court and the Supreme Court, that the proceeds in the Treasury of property captured or abandoned and never confiscated was held in trust for such persons as were former owners as the Government might see fit to return it to, to the extent of their just claims. United States v. Padelford, 9 Wall., 531; United States v. Klein, 13 Wall., 128; Lincoln v. United States, 50 C. Cls., 70.
In none of these cases has it ever been intimated that anyone ever had a claim under that act for money either justly or wrongfully taken from them by any officer of the Government.
Let us suppose that Cutler instead of exacting one-fourth of the New York market price for the cotton in question had purchased it from the owner outright under the provisions of said section 8 of the act of July 2, 1864, and paid the owner therefor within 25 per cent of the New York market price, as he might have done. Would it be contended that any cotton had been taken from the owner, the proceeds of which were in the Treasury ? And yet this is practically the effect of what was done in this case.
In conclusion, we do not think this claim comes either within the letter or the spirit of section 162 and the correlative statutes quoted. At the time of this transaction the Kouns firm could not have made any disposal of the cotton in question had it not been for the provisions of said section 8, it being insurrectionary territory. That section prescribed the method and the conditions upon which it might be sold to the Government. The firm complied with those conditions and were doubtless glad to do so. We do not think where one only complies with the law in his transaction with the Government in the sale of cotton and receives all that the law allows him he has any valid claim under section 162 of the Judicial Code.
*118 It follows from the foregoing that the said demurrer should be sustained, with 40 days to amend her petition, and it is so ordered.
All concur.