Snow, J.
Although the evidence, findings and arguments have covered a wide range, the issues of law directly presented by the *18 record are limited in number and scope. In their final analysis they involve the single question of the extent of the powers invested in the public service commission to make regulatory orders. Convenience calls for a statement and consideration of the orders in groups, assembled according to their subject matter.
I. Orders 3, 4, 5 and 9.
The appellants are corporations organized under the laws of New Hampshire to do utility business in this state. The Associated Gas & Electric Company, hereinafter called the Associated company, is a New York corporation holding directly or indirectly the stock of numerous widely scattered operating utilities and of numerous affiliated companies. The New England Gas & Electric Association hereinafter called the New England association, is a Massachusetts trust holding the shares of various utility companies in New England. A group of individuals in New York hold a controling interest in each of the two major companies. The affiliated companies include engineering, construction, management, purchasing, advertising, financing and accounting corporations which, in their respective capacities, serve the operating units. These various companies are more or less interrelated by stock ownership or interlocking directorates and, taken together, are spoken of as the Associated Gas & Electric System, hereinafter called the System. The signs and stationery of the local utilities carry this designation. Among such affiliated companies are the J. G. White Management Corporation, hereinafter called the Management corporation, and the Associated Appliance Corporation, a purchasing and sales company, all of which sustain contract relations in their respective capacities with each of the appellants.
In 1924 the Associated company acquired the stock of the Portsmouth Power Company, now the appellant New Hampshire Gas & Electric Company, hereinafter called the New Hampshire company. In 1928 the stock of the Derry Electric Company, hereinafter called the Derry company, was acquired by the System through the Management corporation. In 1930 the property of the Derry company, sold on foreclosure sale, was purchased by the New Hampshire company which has since operated the plants of both appellants. The New England association is now the sole stockholder of the New Hampshire company.
Each appellant has a contract with the Management corporation dated June 1, 1929, for a term of ten years, entitled “Agreement for Managerial Services,” calling for a remuneration to the latter of 2.5% *19 of the gross earnings of the utility. These contracts are of a comprehensive nature as respects both the authority conferred and the services to be performed, but are expressly subject to “such limitations as the laws of the state . . . impose.” Each expressly disclaims the surrender or abandonment by the directors of the utility of any powers or duties imposed upon them by law, or the investment of such manager with any non-delegable authority or duties.
The appellants, at the behest of the Management corporation, have abandoned the appliance business which they formerly conducted at a profit, and have submitted to arrangements made for them with the Associated Appliance corporation dated December 1, 1928, under which the latter consigns all appliances to the former which sell them upon a commission basis, — the profits beyond a commission of 2.5% inuring to said corporation instead of to the utilities. No charge is made by either utility for storage or display space. The appellants permit their employees during working hours, and on their own account, to sell the securities of the Associated company. A substantial number of the employees of both utilities are licensed to make such sales.
The commission finds that “From a practical standpoint both New Hampshire Gas & Electric Company and Derry Electric Company are controlled and operated by the Associated Gas & Electric Company ... If we look through the shell to the substance, all these trusts and companies are really a unit operating a utility in New Hampshire, and justifying the ‘System’ title which they bear . . . the local utility officials, irrespective of their title, act merely as subordinates to the real voice of management and control located in New York. From there, authority is transmitted to the office of the New England Gas & Electric Association, Cambridge, Massachusetts. From there, it is sent to the local employees.” The commission further finds “that the J. G. White Management Corporation is managing and in fact operating a ‘plant or equipment... for the manufacture or furnishing of light, heat (or) power . . . for the public ’ and is a public utility as defined by P. L., c. 236, s. 4, and [rules] that the commission having never made a finding that the ‘contract for the operation of’ the works and system of New Hampshire Gas & Electric Company and Derry Electric Company ‘will be for the public good and (made) an order assenting thereto’ that both said management contracts are void until P. L., c. 240, secs. 28 and 29 are satisfied.” 14 N. H. P. S. C. 98, 116.
On these findings and ruling the commission ordered
“3. that New Hampshire Gas and Electric Company and Derry Electric Company hereafter pay no sums to the J. G. White Manage *20 ment Corporation under said contracts of June 1, 1929, unless and until upon proper petition the Public Service Commission shall find said contracts to be for the public good, and make an order assenting thereto;
“4. that the New Hampshire Gas and Electric Company and Derry Electric Company henceforth discontinue the present practice of selling appliances for and on behalf of the Associated Appliance Corporation;
“5. that so long as New Hampshire Gas and Electric Company and Derry Electric Company do not engage in a so-called appliance business they shall not provide storage or other space for appliances sold or display space for appliances sold at their offices without adequate recompense therefor;
“9. that New Hampshire Gas and Electric Company and Derry Electric Company forthwith discontinue the present practice of permitting certain of their employees to sell stock of the Associated Gas and Electric Company during hours when said employees are engaged to perform duties for said utilities.”
The appellants contest not only the findings of the commission, but its ruling that a contract of the nature of that found to exist between each appellant and the Management corporation, or between each appellant and the affiliates of the System as a unit, was a “contract for the operation of its [the utility’s] works and system,” requiring commission approval under P. L., c. 240, ss. 28, 29. The question of the interpretation of this phrase is presented. These sections read: “Any public utility may transfer or lease its franchise, works, or system, or any part of such franchise, works or system, exercised or located in this state, or contract for the operation of its works and system located in this state, when the commission shall find that it will be for the public good and shall make an order assenting thereto, but not otherwise.” s. 28. “Any such attempted transfer, lease or contract shall be void unless the same shall have been approved by the commission.” s. 29.
In the parent act this provision (s. 28) was paragraph (b) of Laws 1911, c. 164, s. 13, which was interposed between provisions requiring like commission approval, (a) to the commencement of business by a utility and (c) to the acquisition of the stocks or bonds of another utility engaged or preparing to engage in the same or similar business. The evident purpose of s. 13 (as amended by Laws 1913, c. 145, s. 13 (a) (b) (c)) was to assure competence of the utility to meet the public need and to preserve to each utility its corporate integrity and its *21 exclusive field of operation. Commencement of business, transfer of franchise and acquisition of securities, were severally proscribed, except upon a finding by the commission that the public good would be promoted thereby. In each phase of its proscription, whether the utility in question was designing to originate a business, proposing to transfer it or planning to acquire a like business by security ownership, the legislature was dealing with the proprietorship of the business. This is evidenced by the adjacent provisions of the parent act and its amendment. The significance of the word “ contract ” is foreshadowed by the preceding section (s. 12 b) where like prohibitions were laid down as to railroads. It was made plain that contracts there subjected to like commission approval were such as contemplated a transfer of the franchise of the railroad or the right under it to “own or operate” a railroad. By amendment of s. 13 b, a two-thirds stock vote (of stockholders present and voting) is made necessary to the authorization of “any such transfer lease or contract” if either party thereto is a corporation. Laws 1915, c. 52, s. 1; P. L., c. 240, s. 30. It is unlikely that the legislature would have subjected contracts of management to such a requirement. By the words “contract for the operation of its works and system” the legislature evidently had in mind contracts which involved a surrender of the proprietorship of the utility, and a delegation to another of its public duties.
The same result is reached by the application of the rule of construction that words are to be read in their proper relation to their context. The clause in question must be construed with the preceding words “transfer or lease” in the same sentence. It is as though the enumeration of the actions which a utility may take with commission approval had read “Any public utility may transfer its franchise, works or system ... or [make any other like] contract for the operation of its works and system.” Corey v. Bath, 35 N. H. 530, 538; Trustees of Phillips &c. Academy v. Parish, 68 N. H. 10, 11. By these terms the legislature intended a contract in the nature of a transfer or lease which takes from the corporation the right to direct how the enterprise should be carried on. It is argued that the line should be drawn between a contract of employment and a transfer of limited title to the property. Whether a contract deputing to another the full control of methods and operation but reserving to the owner the profits of the operation with a concurrent liability for losses, is rightly termed a contract of employment is not important. The statutory test is control of the operation of the enterprise. If this is to be surrendered under any form of contract, the consent of the commission is required.
*22 It is unnecessary to determine whether, on the evidence, it could be found that the contracts of the appellants with the Management corporation and other affiliates of the System are contracts within the meaning of P. L., c. 240, ss. 28, 29, as thus interpreted, for, assuming that it may be so found, the commission, as will be seen later, was without authority to make the orders here under consideration. For the same reason the bearing of the relations of ownership and control between the contracting parties upon the validity of the contracts has not been considered. It is not intended to express herein any opinion upon the legal character of the contracts.
II. Orders 1 and 2.
The appellant companies have been financed by funds borrowed of the controling corporations or trusts in the System on what have been termed “open accounts.” The modus operandi consists in the local utility being put in funds by its stockholder, the New England association, which enters the amount loaned upon its books and those of the local utility. The loan is further evidenced by vouchers for each transaction, likewise entered on the respective books of account. It is subject to monthly interest charges made in like manner. So far as appears the open account is payable on demand, but there is no agreement, or expectation, that a demand will be made within a year. The stockholder company may carry the account or place it with another trust or corporation in the System. Loans in various amounts to each of the appellants have been made in this manner and passed around among the affiliated companies of the System since sometime prior to 1926. When the New Hampshire Company was acquired by the System, it had outstanding $1,394,000 face value 6% gold bonds and $500,000 par value 7% preferred stock, By authority of the vote of the directors of April 6, 1926, the bonds were called at 105, as permitted by the mortgage, and by vote of May 21, following, the preferred stock was called at 110. The funds advanced for these purposes were charged to the local company on the open account. The loans made in this manner which, prior to 1926, were comparatively small, have been increased from time to time until on December 20, 1930, the aggregate amount owed by the New Hampshire company was $3,963,110, of which $1,867,706 had been applied to the retirement of its bonds and preferred stock and $873,950 represented the purchase price of the property of the Derry company. The balance represented money advanced for extensions, improvements and other purposes, the capitalizability of some of which appears to be in question. There is no adequate separation of capital *23 and income or segregation according to the need or purpose of the borrowing or to the use made of the proceeds. The commission ruled that “the financial obligations created by this open account method unless approved by it constitute a violation of the provisions of P. L., c. 241, s. 1, as amended by L. 1929, c. 136.” 14 N. H. P. S. C. 108.
On these findings and this ruling orders were made:
“ 1. that the New Hampshire Gas and Electric Company and Derry Electric Company shall hereafter borrow no money by said open account method except to such extent and upon such terms as may be approved by the Public Service Commission;
“2. that New Hampshire Gas and Electric Company and Derry Electric Company hereafter pay no interest upon any sums owed under said open account until the Public Service Commission after notice and hearing determine what terms are consistent with the public good.”
The ruling of the commission presents the question whether “open accounts,” evidenced by the books of a utility and of its creditor, and supported by vouchers entered thereon for each separate transaction stating the purpose of the loan, may be found to be “other evidences of indebtedness” within the meaning of P. L., c. 241, s. 1 as amended by Laws 1929, c. 136; and whether such open accounts like “stock, bonds, notes” of the utility, can be issued only upon approval of the commission. P. L., c. 241, is entitled “Issuance of Stock and Other Securities” and provides, “Purposes. A public utility . . . lawfully engaged in business in this state may, with the approval of the public service commission, but not otherwise, issue its stock, .bonds, notes and other evidences of indebtedness payable more than twelve months after the date thereof, for the purpose of defraying the cost of acquiring property of any kind which is reasonably requisite for present or future use in the conduct of its business in this state, or of constructing, completing, extending or improving its plant, equipment or facilities for doing such business, or of maintaining or improving its service to the public within this state, or of providing itself with working capital, or for any other purpose authorized by law, including the payment or refunding of any outstanding indebtedness or securities issued for any such purpose.” Laws 1929, c. 136, entitled “An Act Relative to the Issuance of Short Term Evidences of Indebtedness by . . . Public Utilities” extends the inhibition of c. 241, s. 1 without commission approval to “notes, bonds, or other evidence of indebtedness, payable less than twelve months after the date there *24 of, to an amount exceeding forty per cent of the par value of its outstanding capital stock, etc.” — such approval to “extend to the rate of interest on such securities and the terms upon which they may be disposed of.” s. 1.
The immediate subject with which the legislature was dealing in P. L., c. 241, was the limitation of the capital investment of the utility represented by its capital stock and debts of a permanent character as distinct from temporary financing incident to current operations. Whatever subsidiary purpose may have been in view it is apparent that the main object of the legislature was to establish and preserve a proper base for regulation of rates and service. This is evidenced not only by the position of the chapter immediately preceding c. 242 investing the commission with the power, and imposing upon it the duty, of such regulation, but by the express limitation upon the use of the proceeds of such securities for specified capital expenditures, c. 241, s. 1. Application must be filed by the utility disclosing in reasonable detail the amounts, for such defined purpose, “which it may desire to capitalize.” s. 2. The commission, upon hearing, shall determine the cost of such items and authorize “the issue of such securities upon the terms proposed” if it finds the issue is consistent with the public good. s. 3. The utility “may issue its bonds, notes or other evidence of indebtedness payable more than twelve months after the date thereof, at such rate of interest, and dispose of the same upon such terms, as the commission shall approve.” s. 7. The utility may not apply the proceeds of “any stock, bonds or notes to any other purpose than those specified” in the order (s. 12), and must file with the commission an account of such disposition, s. 13. The chapter forbids the capitalization of franchises (s..lO) and authorizes the increase, with commission approval, of the “ capital stock or bonds [of a utility] beyond the amounts fixed and limited by its articles of association or its charter or by any act of the general court.” s. 16.
It is clear that the immediate design of the legislature, by these provisions, was to limit not only the capital of the utility as represented by its stock, but also its other obligations so far as they are designed to supplement capital by borrowings of a permanent character; the ultimate purpose being, as we have seen, to preserve a proper base for the determination of the “just and reasonable” rates which the commission is required to fix by order. P. L., c. 240, ss. 2, 6; c. 242, ss. 1, 7. It follows that the words “other evidences of indebtedness” must be understood and construed with reference to the capital and permanent character of the securities rather than with *25 regard to any peculiarity of their form or negotiable quality. It is only as the securities sought to be issued will accomplish the need of financing of a capital character that the enumerated kinds, namely, “bonds, notes,” particularize the kind of securities the legislature had in mind. Open accounts and vouchers which find a market, even though in a limited field, satisfy these characteristics. They are ejusdem generis with bonds and notes in respect to the subject-matter under consideration. The difference between negotiable bonds on the one hand, and open accounts with accompanying vouchers acceptable in the market on the other hand, is immaterial to the operation of the statutory provisions limiting and regulating their issue as a rate base. The basis of the ejusdem generis rule is that the mention of one thing followed by a general descriptive term gives color and meaning to the class covered by the latter and limits that class to the things having a likeness to the specified thing. The likeness contemplated by the rule, however, is as to characteristics material to the purpose of the classification. It was as to the utility of bonds and notes in making up the capital structure in a more or less permanent way that these particular terms were used. Any other form of security capable of filling this need is ejusdem generis with those enumerated. Moreover the rule is always subject to the qualification that general words are to be construed more broadly than the specific words where such construction is clearly needed to give effect to the meaning of the legislature. Cutler v. Kouns, 110 U. S. 720; United States v. Mescall, 215 U. S. 26, 31; Danciger v. Cooley, 248 U. S. 319, 326. The very evident purpose of the legislature in requiring commission approval for capital items, namely, to preserve a proper rate base, would be frustrated if a method of financing outside the purview of the statute could be devised by the open account method which would enable the whole credit structure of a utility to escape commission control. The reasonableness or otherwise of one or the other construction is a matter competent for consideration. Clough v. Railroad, 77 N. H. 222, 230 and cases cited; Eyers Woolen Co. v. Gilsum, 84 N. H. 1, 4; Sauriolle v. O’Gorman, post 39. For what the legislature had in mind, loans evidenced by book entries and vouchers which find a market are of the same kind as bonds and notes, and may be found to be within the terms of the statute. The meaning of the statute in this respect is not affected by the subsequent extension of the requirement of commission approval by the amendment of 1929 to short term or non-capitalizable securities when out of proportion to capital.
*26 Here again it is unnecessary to pass upon the factual issue since, if the open account here can be found to be an evidence of indebtedness within the terms of the statute, and therefore subject to commission approval, the orders are unauthorized for reasons that will appear in later discussions.
III. Orders 6, 7 and 8.
On May 1, 1911, the Derry company signed and acknowledged a mortgage deed of its property to a trustee to secure its bonds. Under it, $50,000 face value of 5% bonds were issued and the proceeds thereof used in connection with the purchase of the property of the Derry Electric Light Company, and other local utilities. The deed remained unexecuted by the trustee until May 25, 1911, ten days after the effective date of Laws 1911, c. 164, the act creating the public service commission. No direct authority under the statute (Id., ss. 13, 14; P. L., c. 240, s. 27; c. 241, ss. 1, 31), was sought or obtained for such transfer or for the issue of such bonds, though later issues received commission approval. Default was made of these bonds on May 1, 1929, with the consent of the Associated company, or one of its affiliates, then owner of the stock of the Derry company. The property of the latter was thereafter (Mar. 18, 1930) sold at auction on foreclosure sale and bid off for the New Hampshire company for $547,591, the bid figure including “the entire indebtedness secured and unsecured of the Derry Company.” This bid was later voluntarily increased by the purchaser to $873,950 which amount purported to represent the valuation of the property as fixed by an engineer of the System. The New England company financed the deal and charged the New Hampshire company with this amount in the open account. The evidence was conflicting upon the questions whether the bond-holder was an owner for value without notice or knowledge of any infirmity therein, and as to the good faith of the sale, stockholder’s authorization, etc. On the evidence the commission “finds void the attempted transfer of the franchise, works or system of the Derry Electric Company to the New Hampshire Gas & Electric Company under P. L., c. 240, s. 29”; and rules “that for New Hampshire Gas & Electric Company legally to operate as an electric public utility in the towns served by the Derry Electric Company, there must first be obtained the permission and approval of the commission under P. L., c. 240, s. 21 . . . that if any financial obligations to the New Hampshire Gas & Electric Company were created by said book entry as of April 1, 1930 made December 16, 1930, and said supporting voucher for $873,950.29, that it constitutes a viola *27 tion of the provisions of P. L., c. 241, s. 1, as amended by L. 1929, c. 136.” 14 N. H. P. S. C. 135.
The orders are:
“6. that unless and until, upon proper petition, the Public Service Commission by order authorizes the New Hampshire Gas and Electric Company to do business as a public utility in the territory served by the Derry Electric Company, said New Hampshire Gas and Electric Company shall not so engage in business;
“7. that New Hampshire Gas and Electric Company strike from its books all entries evidencing financial or other obligations made in connection with the purported acquisition by it of the franchises, works or system of Derry Electric Company located in this State;
“8. that unless and until, upon proper petition, the Public Service Commission by order authorizes the New Hampshire Gas and Electric Company to acquire the franchises, works, and system of the Derry Electric Company, said New Hampshire Gas and Electric Company shall pay no sums as principal or interest on account of said purported acquisition.”
It is claimed on behalf of the appellants that the purchase of the Derry property at foreclosure sale by virtue of the mortgage was authorized by law, and that thereby the New Hampshire company acquired the right to do business in the Derry territory without the consent of the commission. The Derry company could not transfer to its bond-holders any right it did not own. As that company could not, after 1911, have sold its right to do business in its territory directly to the New Hampshire company, and thereby conferred upon the latter the right to do business in the Derry territory without the consent of the commission, it is clear that no such non-existent right could be created by way of mortgage. The power of sale inserted in the mortgage did not confer upon the mortgagee any right to sell which the mortgagor did not possess. Much less did it confer a right which, under the law, no one could possess.
The bond-holders had the right to foreclose by sale. But the right of the purchaser at such sale to do business in the Derry territory was dependent upon commission consent. Such purchaser would take precisely what one who bought directly from the mortgagor would acquire, and nothing more.
Whether the bond-holders of the first issue (which was partly executed before the commission act took effect) could have taken title by strict foreclosure and operated the plant themselves without commission approval, is a question which does not arise here. They *28 undertook to sell and transfer to a third party, and their right so to do is not more extensive than that of the mortgagor.
They took by way of mortgage only title to the franchise. The sanctity of that right as against the state was not increased by that transaction. The franchise was amendable or repealable under the reserved power, whoever held title to it as against the original grantee from the state. Lorenz v. Stearns, 85 N. H. 494. The contract between the Derry company and its bondholders is protected from state interference. But that contract was not impaired by state action regulating the exercise of the state granted and state repealable franchise. The reserved power to amend or repeal is superior to any transfer by the grantee of a franchise, and franchise purchasers always take subject to it.
It appears to be conceded that the enactment regulating the sale of utility franchises was valid as against the utility itself. It is no less so against its grantee by way of mortgage. “The bondholders contracted subject not paramount to the proviso for repeal. ’ Calder v. Michigan, 218 U. S. 591, 599.” Lorenz v. Stearns, supra.
The theory advanced in the cases relied upon by the appellants (People v. Commission, 203 N. Y. 299; Philadelphia Trust Co. v. Company, 258 Pa. St. 152), that to compel the purchaser at foreclosure sale to secure commission consent would violate the sanctity of the mortgage contract, fails to consider what the utility had which it could mortgage. That was not an unrestricted franchise, but a limited one. In so far as those cases countenance a theory that a conveyance of a franchise by mortgage broadens the franchise right as against the state, they are not in accord with the local view of that transaction.
If the commission approval of a later mortgage could be interpreted to mean that a grant of consent to operate was thereby given to whoever should buy at foreclosure sale, it is evident that it would be void as beyond the power given to the commission. The requirement that the propriety of each specific transfer be passed upon by the commission cannot be avoided in that way.
Although, upon the facts as they now appear, and the law applicable thereto, the acquisition of the Derry property by the New Hampshire company was not assented to as the statute requires, the orders here are nevertheless unauthorized.
The conclusion that such orders, as well as those previously discussed, are void for want of authority is reached upon a consideration of the purpose and design of the act establishing the public service *29 commission (Laws 1911, c. 164) and the special and limited character of the powers conferred upon it. These subjects have already had some consideration by this court. The establishment of the commission “marked a broad change in state policy as to the control of public utilities. The whole subject was in large measure committed to the commission.” Lorenz v. Stearns, supra. “By this act the: legislature undertook by comprehensive provisions to institute a new system for the establishment and control of public utilities in the state. It created the public service commission as a state tribunal, imposing upon it important judicial duties and endowing it with large administrative and supervisory powers.” Parker-Young Co. &c. v. State, 83 N. H. 551, 556. Such powers are, however, only such as the legislature has delegated to it, and such delegation “does not extend beyond expressed enactment or its fairly implied inferences .. . power and authority not granted are withheld.” Petition of Boston & Maine Railroad, 82 N. H. 116; Boston & Maine Railroad v. State, 77 N. H. 437, 444. This is but a terse statement of the rule prevailing in all jurisdictions. Backus-Brooks Co. v. Railway, 21 Fed. Rep. (2d) 4, 19, 20; Northern Pacific Railway Co. v. Commission, 47 Fed. Rep. (2d) 778, 779; Siler v. Railroad, 213 U. S. 175, 194; Railroad Commr’s v. Company, 17 Ore. 65, 77; Swarthmore v. Commission, 277 Pa. St. 472, 478; 51 C. J. 36.
The paramount object of the legislature was to assure to the public adequate utility service at fair rates. This is apparent by the legislative approach to the subject in the parent act. Laws 1911, c. 164. Having defined essential terms (s. 1), provided for the establishment of a public service commission and defined its procedural rules (s. 2), and having invested it with the powers possessed by the former board of railroad commissioners (s. 3), the legislature immediately discloses the purpose of its enactment by its mandate, “Every railroad corporation and every utility shall furnish such service and facilities as shall be reasonably . . . adequate and in all respects just and reasonable. All charges made or demanded by .. . any public utility .. . shall be just and reasonable and not more than is allowed by law or order of the commission,” and by the accompanying prohibition of rates in excess thereof, s. 4. Under this act as amended (P. L., cc. 236-242), the powers and duties of the newly created tribunal are explicitly defined and limited.
The orders which the commission is authorized to make are, generally speaking, of two classes, namely (1) those directly affecting service and rates (c. 236, s. 5; c. 240, s. 2; c. 242), (2) those which are *30 designed indirectly to assure their permanence and stability, as well as their adequacy and fairness. The latter class includes orders conferring upon a utility the right to commence business (c. 240, ss. 21, 24), acquire the stocks or bonds of another utility (Id., s. 31), transfer its franchise, works or system (Id., s. 28), and to change its capital structure, c. 241, s. 1. Authority of the commission to make orders of the first class is plenary save in a few specifically excepted instances. Lorenz v. Stearns, supra. Authority to make orders of the second class is limited to the granting or withholding of commission approval to proposed utility action otherwise expressly forbidden by the statute. In the former class the commission is expressly authorized, upon notice and hearing, to “make such order, ... as may in its opinion be necessary to establish just and reasonable rates or charges or to require the making of any reasonable and just improvements in service or methods.” P. L., c. 238, s. 5. See c. 240, s. 6; c. 242, s. 7. Such orders may be made upon complaint in behalf of the public, upon petition of the utility or in proceedings instituted by the commission on its own motion. In the second class, the utility is the necessary proponent of the mooted order, and the commission is given no other power than to approve or disapprove the request of the utility, either in whole or in part, depending solely upon its judicial determination of the factual issue of whether or not the public good will be promoted thereby. Disregard of this distinction and limitation is chiefly responsible for the commission’s misinterpretation of its powers so far as its orders are predicated upon the provisions of the statute authorizing approval of utility conduct otherwise forbidden.
It is to be observed that none of the orders purport directly to regulate rates or service. In all of them the commission apparently proceeded upon the erroneous assumption that grant of power to withhold approval to any requested utility action requiring such approval, by implication, authorized it to enjoin such action as well as any conduct in furtherance thereof. To be specific, orders 3, 4, 5 and 9 appear to be based upon the finding and ruling that each of the appellants has “ contract [ed] for the operation of its works and system” without the assent of the commission, contrary to P. L., c. 240, ss. 28, 29, and accordingly forbid each to pay money to its contractee, make sales in its behalf, provide storage for its goods, or permit employees to sell its securities; orders 1 and 2 purport to be founded upon a finding and ruling that the appellant New Hampshire company has “issue[d] its . . . evidences of indebtedness” in the form of open ac *31 counts and vouchers without the commission’s approval, contrary to P. L., c. 241, s. 1, and Laws 1929, c. 136, s. 1, and for that reason forbid it to pay interest thereon or make further borrowings by that method; while orders 6, 7 and 8 appear to be grounded upon findings and rulings that said company is engaged in business in the field occupied by the other appellant without commission approval, contrary to P. L., c. 240, ss. 21, 24, and has acquired its securities contrary to P. L., c. 240, ss. 31, 32, and accordingly forbid it to so engage or to retain on its books entries relating to the purported acquisition.
If the commission’s primary findings and rulings on which such orders are based are well founded, the appellants have violated the several cited statutory provisions, and are subject to the penal provisions of the statute. P. L., c. 238, s. 39. Orders of the commission forbidding the utilities further to pursue their wrongful conduct add nothing to the inhibitions of the statute, and it is wholly improbable that the general court intended to invest the commission with power to order a utility to obey the law and thereby subject it to a double penalty in case of disobedience. The fact that commission authority to add its enjoining mandate to that of the statute would serve no reasonable or useful purpose is a strong ground for holding that power to make such an order was not intended to be granted by implication.
The state has pointed out no provision of the statute containing express authorization for any of the foregoing orders. Some reliance, however, is placed upon P. L., c. 240, s. 3 as giving rise to implied powers. It reads “Extent. The public service commission shall have the general supervision of all railroad corporations, railroads, public utilities and the plants owned, operated or controlled by the same, so far as necessary to carry into effect the provisions of this title.” It is a sufficient answer to this contention that the legislature would have used more explicit terms if it had intended to grant a general jurisdiction to make enjoining orders to a tribunal which has a roving commission to institute the proceedings, formulate the charge against the utility, direct the prosecution and hear and decide the issues (State v. Company, 85 N. H. 218), and which may provide its own mode and manner of hearings in disregard of the usual rules of evidence. P. L., c. 238, ss. 9, 10. The suggested construction has, however, received consideration and been rejected by this court. Construing similar language in the act establishing the railroad commission (Laws 1883, c. 101, s. 4), it was said, in Petition of Boston & Maine Railroad, 82 N. H. 116, 118, the “general supervision” there given “is to be construed in the light of the entire act and the con *32 text . . . Having only such authority to regulate as was expressly defined, the commission was not invested with authority beyond regulation. General supervision did not give general jurisdiction, and the import of the words was only to establish incidental authority to reenforce the specific powers mentioned. It was ancillary rather than superior to them.” This is equally applicable to the language of P. L., c. 240, s. 3.
Reliance appears also to be placed on the broad powers of oversight and investigation bestowed upon the commission by the succeeding sections as importing a general power to make orders. These give the commission power, and impose upon it the duty, “to keep informed as to all .. . public utilities in the state, their capitalization, franchises and the manner in which the lines and property controlled or operated by them are managed and operated, not only with respect to the adequacy and accommodation afforded by their service, but also with respect to their compliance with all provisions of law, orders of the commission and charter requirements.” ss. 4, 6. This grant of power and imposition of duty, however, like that to investigate and inspect, elsewhere bestowed and imposed (P. L., c. 238, ss. 6, 7, 8, 19), are merely auxiliary to other express powers and duties. It is not, however, ancillary alone to the commission’s order-making power; but, as foreshadowed by the terms of ss. 3, 4, such authority and duty were bestowed and imposed upon the commission in part as a basis for its action as the enforcement agency of the state. Grafton County &c. Co. v. State, 77 N. H. 539, 540. As abundant occasion for such investigation and inquiry exist incident to duties expressly imposed, the authority and duty to make them do not, by any fair inference, support an implied power to issue enjoining orders correcting illegal conduct disclosed thereby.
The statute affords no machinery for the direct enforcement of statutory mandates or orders of the commission, but provides that “Whenever the commission shall be of opinion that a . . . public-utility is failing or omitting, or about to fail or omit, to do anything required of it by law, or by order of the commission, or is doing anything, or about to do anything, or permitting anything, or about to permit anything, to be done contrary to, or in violation of, law or of any order of the commission, it shall have authority to lay the facts; before the attorney-general, and to direct him immediately to begin an action in the name of the state praying for appropriate relief by mandamus, injunction or otherwise.” P. L., c. 240, s. 39. See also c. 238, ss. 41, 42. The explicit statutory directions defining the pro *33 cedure for correcting and restraining any illegal action of utilities, tend to negative the claim of any implied authority in the commission directly to make enjoining orders.
In the performance of its duties under these sections of the statute the commission acts in a supervisory and inquisitorial capacity, in which its function is not unlike that of a grand jury, to present for reasonable cause charges against a utility in the nature of an information for a breach of the statute or of its own authorized orders. In so far as the present proceedings are instituted in the exercise of this function, the findings and rulings of the commission have no force or effect except as they tend to persuade the commission that there is reasonable cause to invoke the action of the attorney-general, and are not appealable here.
IV. There remain to be considered orders 10 and 11.
It has been the practice of the owners of the appellant companies to keep all books and accounting records in the office of the New England association at Cambridge, Massachusetts. The running expense of the office is divided pro rata among all subsidiaries on the basis of gross revenue, though any savings effected thereby on federal income taxes inure to the New England company. No independent representative of the local utilities has anything to say about the division. This centralization of bookkeeping is a matter of convenience as well as of economy in clerical expense. The experience, however, during this investigation was that the method of filing inter-company papers and records complicate ready access to the representatives of the commission. It is considered by the commission, notwithstanding the added expense, that all local utilities should maintain within the state an office and staff which may be the official source of all data relating to their management and operation and that “any staff outside the state for the accommodation of the owners should not be at the expense of the local utilities.” 14 N. H. P. S. C. 165. It was therefore ordered,
“10. that the New Hampshire Gas and Electric Company and Derry Electric Company shall maintain in the State, original books and records relating to all details of operation and management until upon proper petition the commission shall otherwise order; and
“11. that the New Hampshire Gas and Electric Company and Derry Electric Company contribute no sum for the maintenance of a general office and staff in association with foreign trusts or corporations outside the state of New Hampshire, except such as may upon proper petition be approved by the Public Service Commission.”
*34 These orders are based on the following provision: “Accounting Systems. The commission may, whenever it deems advisable, establish a system of accounts and records to be used by . . . public utilities for their business within this state, may classify them and prescribe a system of accounts for each class, and may prescribe the manner in which said accounts shall be kept.” P. L., c. 240, s. 7; Laws 1911, c. 164, s. 6.
Taken literally, the system which the commission is here authorized to establish is of “accounts and records,” while the “manner” of keeping which it may prescribe is limited to “accounts.” As, however, the statute as amended (Laws 1913, c. 98, s. 1; P. L., c. 240, s. 12) commands the utility to “keep the accounts and records so prescribed ... in the manner prescribed,” it is manifest that the authority to provide the manner of keeping was understood and intended to apply alike to both.
The arguments of counsel on the construction of this section have been directed solely to the restriction as respects the place of keeping of such accounts and records, and consideration has accordingly been limited to this feature.
The word “manner” means the “mode or method in which something is done.” Webster's Diet. In ordinary parlance it carries no thought of place. Had the legislature intended to authorize the commission to restrict the place of keeping, it is fair to assume that it would have used language expressive of that idea. It is significant that when the legislature came to deal with corporate records (Laws 1919, c. 92, s. 26; P. L., c. 225, s. 69), it used language which left no doubt of its meaning, namely, “true record of all meetings of the stockholders shall be kept .. . within the state.” See P. L., c. 225, s. 65; P. S., c. 148, s. 10, et. seq. It is likewise significant that by Laws 1913, c. 145, s. 8; P. L., c. 240, s. 17, the legislature recognized the custom and right of utilities to keep accounts and records without the state. It there provided: “The commission, by order, may require any . . . public utility to produce within the state, at such time and place as it may designate, any accounts, records, memoranda, books or papers kept in any office or place without the state, or verified copies thereof, in order that an examination thereof may be made by the commission or under its direction.”
It is our conclusion that the express authority granted the commission by P. L., c. 240, s. 7 to prescribe the manner in which the records and accounts shall be kept in any system it may establish thereunder does not by any “fairly implied” inference (82 N. H. 116) *35 authorize the commission to require such records and accounts to be kept within the state. The power to order a utility to produce its accounts and records within the state “in order that an examination thereof may be made by the commission” (P. L., c. 240, s. 17), could not have been intended to authorize an order that they be “maintained” within the state.
The orders are without statutory authority express or implied.

Appeals sustained.

All concurred.